UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:19-cr-00961-SRC-1 |
| | ) | |
| ANTHONY CALDWELL, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>Memorandum and Order</u>**

Anthony Caldwell seeks compassionate release claiming that the Bureau of Prisons has neglected his medical needs.  *See* doc. 871.   Having reviewed the record, the Court finds that Caldwell failed to establish extraordinary and compelling reasons that warrant a sentence reduction, and that the factors set forth in 18 U.S.C. § 3553(a) weigh against his release. Accordingly, the Court denies Caldwell's motion.   Doc. 871.

## I.    Background

### A.    Offense background

The Guilty Plea Agreement sets forth the following facts:

Un-indicted co-conspirator Juan Gonzalez supplied fentanyl to Caldwell, Futrell and co-conspirators Roman Frenchie, Michael Moore, Martes Mosely, Tyrone Sims and[,] Kevin White until Gonzalez was arrested by the DEA and [the] U.S. Marshals in September[] 2019.   Futrell and his co-conspirators then obtained another source of supply in Arizona and continued to distribute fentanyl.

Prior to his arrest, Gonzalez would either ship packages of fentanyl through the mail or would hand-deliver the narcotics to co-conspirators Jazmynn Lester and Aaliah Lester, who had traveled to Arizona at the request of Futrell and others.

Jazmynn Lester and Aaliah Lester were "mules" in that they traveled to Arizona to meet with the source of supply in order to pay U.S. currency for the fentanyl and then transport the fentanyl back to St. Louis for distribution.   They were compensated for their role as mules.   Jazmynn Lester also facilitated an address

where fentanyl could be received from Arizona.   Jazmynn Lester was a paramour of co-conspirator Kevin White.

On June 18, 2019 a suspicious package was seized by DEA agents during a parcel interdiction operation at the United Parcel Service (UPS) sorting facility in St. Louis.   The package was deemed suspicious after a drug[-]sniffing canine alerted an agent to the package.   The package was sent from a UPS store in Phoenix, Arizona and was addressed to Kelvin Lester at 6060 W. Cabanne Street, St. Louis, Missouri.   After executing a search warrant for the package, officers discovered two plastic bags wrapped in cellophane that contained compressed white powder.   The substance was later tested at the St. Louis Metropolitan Police Laboratory and it was determined to be 479 grams of fentanyl.   Later the same day, law enforcement conducted a controlled deliver of the package to 6060 W. Cabanne.   Once the owner of the residence brought the package into the residence, officers executed an anticipatory search warrant and recovered the package.   Further investigation revealed that Jazmynn Lester had contacted the owner of the residence on June 17, 2018 and advised that she was expecting a package to be delivered for her boyfriend, Kevin White.   The owner, who is not involved in the instant offense, told police that she had received several packages for White in the past.   She cooperated with police, identified a photo of Kevin White, showed police the phone number used by "Chucky" a/k/a White to check on the status of the package and investigators confirmed in a search of law[-]enforcement data bases that the phone number was associated with Kevin White.

While police were at the Cabanne residence, Kevin White and his cousin T.S. showed up to retrieve the package.   T.S. was arrested after a brief foot pursuit.   White was able to escape in his vehicle.   T.S. later pleaded guilty in the Eastern District of Missouri to possession with intent to distribute a controlled substance.

From at least May 2019 through September 2019, the FBI utilized a confidential informant (CI) who purchased fentanyl from co-conspirators Caldwell, Futrell[,] and Frenchie.   Caldwell conducted hand-to-hand distribution of fentanyl on or about May 8, 2019 and August 14, 2019.   On or about May 22, 2019 Caldwell arranged for the sale of fentanyl to the confidential informant and Futrell showed up to finalize the transaction.

Jimmiesha Williams (hereafter "Williams") provided a safe house at 5713 Ramsey for co-conspirators to conduct their business and would knowingly store narcotics, firearms and U.S. currency in her residence.   She would also register vehicles in her name in order to shield other co-conspirators, especially her paramour Maricus Futrell[,] from potential law enforcement scrutiny.   Williams would also take various vehicles used by co-conspirators to body shops to get them painted, again in an effort to thwart law[-]enforcement scrutiny.

Deniesha Baker (hereafter "Baker") provided a "safe house" or "stash house" at 3740 Melba for her paramour Futrell, where he would store narcotics and U.S.

2

currency (proceeds of his drug trafficking) and she maintained her premises for the purpose of distributing fentanyl.  Futrell and other members of the conspiracy would keep a "lab" at Baker's house, which was comprised of drug paraphernalia used to cut the fentanyl and package it for distribution—grinders, pill presses, scales, empty capsules and Dormin.  Baker would also allow Futrell to keep his vehicles at her residence, again in an effort to thwart law[-]enforcement scrutiny.

Search warrants were executed at Baker's residence, 3740 Melba Place and at William's residence, 5713 Ramsey.  During the search of Williams' residence, officers recovered a multitude of evidence related to the instant conspiracy, including:  one baggie containing 24.1 grams of fentanyl; $13,200.00 in United States currency; eight cell phones; two pill press trays; four grinders; one box of Dormin; a box of plastic baggies; and empty pill capsules.  Officers further found a 2019 Dodge Charger, bearing Illinois dealer plates, parked in the driveway.  Futrell often operated the vehicle.  A computer inquiry of the vehicle revealed it was stolen out of Bloomington, Minnesota.  A search of Deneisha Baker's cellular phone revealed internet history for purchasing grinders and other drug paraphernalia used to package and distribute fentanyl.

During the search of 5713 Ramsey Drive on September 20, 2019, agents found Martes Mosley in the front living room with $705 in United States currency in his right front pants pocket.  Inside Mosley's shoe were two baggies with 41 capsules containing 3.78 grams of fentanyl.  Tyrone Sims, Christopher Turner, and Michael Moore were found together in a bedroom located in the northwest corner of the residence.  In the bedroom agents found a black Lacoste satchel, a blue Lacoste satchel, and a black Pyramio satchel.  The black Lacoste satchel contained the following:  a clear plastic baggie containing 13.8 grams of marijuana; a clear plastic baggie with 25 capsules containing 4.2 grams of fentanyl; $103.25 in United States currency; a silver digital scale; and a black cellular phone.   The blue Lacoste satchel contained the following: one baggie with 10 capsules containing 1.9 grams of fentanyl; a second baggie with 698 capsules containing 6.5 grams of fentanyl; a third baggie [with] 10 capsules containing 2.1 grams of fentanyl; a fourth baggie with 15 capsules containing 3.5 grams of fentanyl; and a semiautomatic Glock, model 23, .40 caliber handgun loaded with one round and an inserted magazine with 11 additional rounds.  The black Pyramio satchel contained the following:  a clear plastic baggie with 100 capsules containing 12.1 grams of fentanyl; a semiautomatic, Glock, model 29, .40 caliber handgun, loaded with one round chambered and an inserted magazine containing six rounds.  On the floor near Sims, Turner[,] and Moore[,] agents found a gold-painted Draco, 7.62mm semiautomatic rifle, with one round in the chamber and an inserted magazine containing 29 rounds of 7.62mm caliber ammunition.  Further, inside a black and silver Nike backpack on the floor near Sims, Turner, and Moore, officers recovered a black Micro Drako brand, 7.62mm caliber firearm which was loaded with one 7.62mm round and an inserted magazine containing 25 rounds of 7.62mm ammunition.  In the bedroom located in the southwest corner of the residence,

3

agents located Jimmiesha Williams along with her juvenile daughter and Maricus Futrell.

During a search of the second bedroom, agents recovered the following:  two bundles of United States currency totaling $9,255 that were wrapped together by a rubber band; a pink purse containing $245.00 in United States currency; and a black Louis Vuitton brand satchel, which was hanging on the inside of the bedroom door. Inside the Louis Vuitton satchel were the following items:  a Glock, model 21, semi-automatic firearm with one round in the chamber and an inserted magazine with 13 additional rounds; one spent firearm projectile found wrapped in a plastic baggie; keys to the white Lexus vehicle parked on the driveway that was registered to Jimmiesha Williams; and keys to the 2019 Dodge Charger that was stolen out of Bloomington, Minnesota[,] which had been recovered during the search of the residence located at 3740 Melba Place.  The fentanyl and five firearms recovered from 3740 Melba Place and 5713 Ramsey Drive were analyzed at the St. Louis Metropolitan Crime Laboratory.  The narcotics recovered from 3740 Melba Place (24.1 grams of fentanyl) and had not yet been encapsulated.  The narcotics recovered from 5713 Ramsey Drive included a total of 858 capsules of fentanyl, weighing 77.81 grams.  All five firearms seized from the Melba Place residence were test fired and functioned as designed.  A search of the firearms through the National Crime Information Center database revealed that the Glock, model 29 was reported stolen on March 18, 2018 from St. Louis County, Missouri.

The precise amount of fentanyl for which Defendant Caldwell is responsible cannot be calculated with absolute precision[;] however, the parties stipulate and agree that [Caldwell] is responsible for at least 1.2 kilograms but less than 4 kilograms of fentanyl.

Doc. 711 at § 4.

## B.      Procedural background

In November 2019, a federal grand jury indicted Caldwell on one count of conspiracy to distribute and possess with the intent to distribute fentanyl in violation of 21 U.S.C. § 841(a)(1). Doc. 1 at 1–2 (The Court cites to page numbers as assigned by CM/ECF.).  In August 2022, Caldwell pleaded guilty to a lesser-included-conspiracy charge.  *See* doc. 711 at § 2.  In exchange, the United States agreed to bring no further prosecution in this district relative to Caldwell's conspiracy to distribute and possess with the intent to distribute fentanyl, arising out

4

events set out in the indictment that the United States was aware of at the time of the plea hearing. *Id.*; *see also* doc. 1.

In December 2022, the Court sentenced Caldwell to 240 months' imprisonment and three years' supervised release. Doc. 784 at 2–3. Caldwell appealed his sentence, doc. 786, and the Eighth Circuit Court of Appeals affirmed, doc. 821 at 3–4. Caldwell is currently serving his sentence at FCI Hazelton in West Virginia with a projected release date of August 21, 2037.[1]

In September 2025, Caldwell filed a motion for compassionate release. Doc. 871. The Federal Public Defender chose not to file a supplemental motion on Caldwell's behalf, doc. 887, and the Court did not order the United States to file a response.

## II.    Standard

The compassionate-release statute provides:

**(c)  MODIFICATION OF AN IMPOSED TERM OF IMPRISONMENT.**—The court may not modify a term of imprisonment once it has been imposed except that—

> **(1)**    in any case—
>
> > **(A)**    the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
> >
> > > (i)    extraordinary and compelling reasons warrant such a reduction;
> > >
> > > . . . .

---

[1] *Find an inmate*, Bureau of Prisons, https://www.bop.gov/inmateloc/ (last visited June 3, 2026).

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

18 U.S.C. § 3582(c)(1)(A).

After sentencing, district courts have very limited authority to modify the sentence.  *See* 18 U.S.C. § 3582(c) ("The court may not modify a term of imprisonment once it has been imposed except [under certain listed exceptions]."); *see also Dillon v. United States*, 560 U.S. 817, 824 (2010) ("'[A] judgment of conviction that includes [a sentence of imprisonment] constitutes a final judgment' and may not be modified by a district court except in limited circumstances." (alterations in original) (quoting 18 U.S.C. § 3582(b))); Fed. R. Crim. P. 35(a) ("Within 14 days after sentencing, the court may correct a sentence that resulted from arithmetical, technical, or other clear error.").

The Court may grant compassionate release if the court finds, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," that "extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."  18 U.S.C. § 3582(c)(1)(A).

## III.    Discussion

### A.    Exhausting administrative remedies

"According to the plain terms of § 3582(c)(1)(A), prisoners can bring compassionate-release motions on their own once they have exhausted their administrative remedies."  *United States v. Houck*, 2 F.4th 1082, 1083 (8th Cir. 2021) (citation omitted).  "Exhaustion occurs at the earlier of either (1) when the prisoner has 'fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion' on his behalf or (2) 'the lapse of 30 days

6

from the receipt of such a request by the warden of the [prisoner's] facility.'"  *Id.* at 1083–84 (alteration in original) (quoting 18 U.S.C. § 3582(c)(1)(A)).  "This requirement is a mandatory claim-processing rule."  *Id.* at 1084 (citations omitted).  But "[u]nlike jurisdictional rules, mandatory claim-processing rules may be forfeited 'if the party asserting the rule waits too long to raise the point.'"  *Manrique v. United States*, 581 U.S. 116, 121 (2017) (quoting *Eberhart v. United States*, 546 U.S. 12, 15 (2005) (per curiam)).  As such, courts enforce the rule when the opposing party properly raises failure to exhaust as a defense.  *Houck*, 2 F.4th at 1084; *Manrique*, 581 U.S. at 121–22.

Caldwell states that he "dutifully exhausted remedies, submitting a request to the FCI Hazelton warden on August 1, 2025."  Doc. 871 at 1–2 (citing 18 U.S.C. § 3582(c)(1)(A)).  He filed his motion on September 30, 2025.  *See id.*  And the United States has not raised the issue of failure to exhaust here.  The Court therefore turns to the merits of Caldwell's Motion.

## B.    Extraordinary and compelling reasons

Caldwell states that a few days before he began incarceration, he "sustained a penetrating gunshot wound."  Doc. 871 at 3.  He asserts that "BOP's stewardship has been abjectly deficient:  no neurological consultations, scant rehabilitative services, and reliance on generalist practitioners ill-equipped for neurosurgical aftercare."  *Id.* at 4.  He claims that his "cognitive frailties, as evinced by his courtroom admission of incomprehension," demonstrate BOP's neglect of his medical care.  *Id.*  Caldwell therefore asserts that "medical dereliction, sentencing disparity, and rehabilitation, coalesces into extraordinary circumstances."  *Id.*

The guidelines explain that medical circumstances may warrant a sentence reduction when the defendant suffers from a terminal illness, exhibits a substantially diminished ability to take care of himself, requires long-term or specialized care that he is not receiving in custody, or

7

is at risk of an ongoing infectious-disease outbreak or public-health emergency.   The applicable guideline provides:

> Extraordinary and compelling reasons [that may warrant a sentencing reduction] exist . . . [if]:
>
> . . . .
>
> (A)   The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end-of-life trajectory).   A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required.   Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
> (B)    The defendant is—
>
> > (i)     suffering from a serious physical or medical condition,
> >
> > (ii)    suffering from a serious functional or cognitive impairment, or
> >
> > (iii)    experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
>
> (C)   The defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death.
>
> (D)   The defendant presents the following circumstances—
>
> (i) the defendant is housed at a correctional facility affected or at imminent risk of being affected by (I) an ongoing outbreak of infectious disease, or (II) an ongoing public health emergency declared by the appropriate federal, state, or local authority;
>
> (ii) due to personal health risk factors and custodial status, the defendant is at increased risk of suffering severe medical complications or death as a result of exposure to the ongoing

8

> outbreak of infectious disease or the ongoing public health emergency described in clause (i); and
>
> (iii) such risk cannot be adequately mitigated in a timely manner.

U.S. Sent'g Guidelines Manual §1B1.13(b)(1)(A)–(D) (U.S. Sent'g Comm'n 2025).

Based on the evidence in the record, Caldwell fails to meet the guidelines' standard for his claims. The evidence does not reflect that Caldwell currently experiences a deteriorating physical or mental condition that diminishes his ability to function in a correctional facility. Dr. Gilbert—the forensic psychologist who assessed Caldwell's competency to stand trial—found that the "evidence supporting malingering in Mr. Caldwell's case is significant": "[h]is approach to looking mentally ill or cognitively disabled was unsophisticated, forced, and unbelievable." Doc. 630 at 19. After conducting several tests, Dr. Gilbert concluded that Caldwell "does not display any evidence of a cognitive disorder associated with a brain injury." *Id.* at 19–20.

In fact, Dr. Gilbert found that "there is absolutely **no** evidence to suggest that he is experiencing any symptoms associated with a severe mental illness or cognitive deficit that would interfere with his ability to understand his pending charges, proceed with the current legal case against him, or assist his attorneys in formulating a defense." *Id.* (emphasis in original). At sentencing, the Court considered "Dr. Gilbert's very thorough report with respect to Mr. Caldwell's condition or mental health and mental cognitive functioning." Doc. 794, Sent'g Tr. at 24:24–25:3. The Court also found that Dr. Gilbert's report suggested that Caldwell's "malingering and related conduct" was "intentionally aimed at getting a lower sentence." *Id.* at 19:6–19:16. The Court therefore finds that that Caldwell's purported health condition does not diminish his ability to function in a correctional facility. The Court also notes Caldwell's purported medical condition is also not currently considered terminal.

9

Additionally, Caldwell failed to demonstrate that the BOP is unable to adequately treat his purported health condition. Despite Caldwell's assertion that his purported health condition necessitates "neurological consultations or specialized follow-up[s][,]" doc. 871 at 1, inmates are "not entitled to any particular course of treatment," *Hancock v. Arnott*, 39 F.4th 482, 488 (8th Cir. 2022) (citation omitted). Considering Caldwell's history of malingering, he fails to support his claim that "generalist practitioners" are "ill-equipped" to treat his purported health condition. *See* doc. 871 at 4. Applying the plain meaning of the applicable guidelines, the Court cannot conclude that Caldwell's purported health condition constitutes an "extraordinary and compelling reason" that warrants a sentence reduction. 18 U.S.C. § 3582(c)(1)(A).

Finally, Caldwell asserts that his "sentencing disparity" constitutes an "extraordinary and compelling" reason for his release. *Id.* But Caldwell "cannot avoid the restrictions of the post-conviction relief statute by resorting to a request for compassionate release instead." *See United States v. Crandall*, 25 F.4th 582, 586 (8th Cir. 2022); *see also United States v. Fine*, 982 F.3d 1117, 1118 (8th Cir. 2020). "A prisoner who collaterally attacks the validity of his conviction must proceed through 28 U. S. C. § 2255, not 18 U. S. C. § 3582." *Fernandez v. United States*, No. 24-556, 2026 WL 1485476, at *3 (U.S. May 28, 2026). And as noted, Caldwell appealed his sentence, doc. 786, and the Eighth Circuit affirmed, doc. 821 at 3–4. The Court therefore rejects Caldwell's assertion that his alleged sentencing issue constitutes an "extraordinary and compelling" reason for his release. 18 U.S.C. § 3582(c)(1)(A).

### C.      Section 3553(a) factors

Even if extraordinary and compelling reasons supported Caldwell's request for a sentence reduction—which they do not—the Court must "consider[] the factors set forth in section 3553(a) to the extent that they are applicable." 18 U.S.C. § 3582(c)(1)(A). Among

others, these factors include "the nature and circumstances of the offense and the history and characteristics of the defendant," as well as the need for the sentence imposed "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."   18 U.S.C. § 3553(a)(1)–(2).   The Court must also consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct . . . ."   18 U.S.C. § 3553(a)(6).

The Eighth Circuit affords district courts "broad discretion" in weighing the section 3553(a) factors.   *United States v. Marcussen*, 15 F.4th 855, 859 (8th Cir. 2021) (citation omitted).   District courts need not "mechanically recite the sentencing factors listed in 18 U.S.C. § 3553(a)."   *United States v. Rodd*, 966 F.3d 740, 748 (8th Cir. 2020) (citation omitted). "When considering the § 3553(a) factors, '[a] district court is not required to make specific findings; all that is generally required to satisfy the appellate court is evidence that the district court was aware of the relevant factors.'"   *United States v. Castillo*, 713 F.3d 407, 412 (8th Cir. 2013) (alteration in original) (quoting *United States v. Perkins*, 526 F.3d 1107, 1110 (8th Cir. 2008)).

After reviewing the section 3553(a) factors, the Court finds that Caldwell failed to carry his burden for release.   When reviewing the nature and circumstances of Caldwell's offense and his history and characteristics, the Court finds that these factors weigh against release.   Caldwell is a member of the Crips street gang.   Doc. 794, Sent'g Tr. at 23:24–24:1.   He was the "organizer or leader of the drug conspiracy that involved five or more participants."   *Id.* at 23:11–23:12.   Caldwell distributed at least 1.2 kilograms, but less than 4 kilograms, of fentanyl, doc. 711 at § 4, "enough to kill a substantial number of people . . . more than the entire population of the City of St. Louis," doc. 794, Sent'g Tr. at 23:18–23:21.   Further, Caldwell's

11

"criminal history includes felony convictions for stealing a motor vehicle; theft of a motor vehicle; resisting arrest; possession of controlled substances; tampering with a motor vehicle, first degree; unlawful possession of a firearm; and resisting arrest.   And he was on parole when he committed the instant offense."   *Id.* at 24:21–24:8; *see* doc. 783 at 55–60.

Caldwell fails to come forward with anything that changes the Court's original analysis at sentencing.   Releasing Caldwell early neither reflects the seriousness of his offense nor provides just punishment for his offense.   And it would give rise to unwarranted sentence disparities among similarly situated defendants.   For these reasons, the Court finds that the section 3553(a) factors weigh against Caldwell's release.   Having thoroughly considered the record and all relevant matters, the Court finds no basis to reduce Caldwell's sentence.

## IV.   Conclusion

For the reasons set forth above, the Court denies Caldwell's [871] Motion for Compassionate Release.

So ordered this 3rd day of June 2026.

_____
STEPHEN R. CLARK
CHIEF UNITED STATES DISTRICT JUDGE